Filed 10/27/15  P. v. Hagerl CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>BENJAMIN HAGERL,<br><br>      Defendant and Appellant. | A141752<br><br>(City & County of San Francisco<br>  Super. Ct. No. 221066-02) |

Defendant Benjamin Hagerl appeals from a judgment entered following his guilty plea to one count of possession of methylenedioxymethamphetamine (MDMA) for sale (Health & Saf. Code, § 11378).  The court sentenced defendant to three years in state prison, to be served in county jail pursuant to Penal Code section 170, subdivision (h)[1].  On appeal defendant challenges (1) the denial of his motion to suppress evidence pursuant to section 1538.5, subdivision (i) (§ 1538.5(i)) on the ground that the police officers' initial warrantless and nonconsensual entry into his apartment violated his Fourth Amendment rights; and (2) the denial of his motion to traverse a search warrant pursuant to *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks* motion) by which he sought to attack "the underlying veracity of statements made on the face of the search warrant application"  (*People v. Hobbs* (1994) 7 Cal.4th 948, 965, citing *Franks, supra*, 438 U.S. 154).  We conclude defendant's contentions do not require reversal.  Accordingly, we affirm the judgment.

---

[1]      All further unspecified statutory references are to the Penal Code.

**Factual and Procedural Background**

A.     Investigation[2]

On the morning of August 11, 2013, at approximately 9:00 a.m., Milton Aparicio was inside Apartment 101A, his residence in an apartment building on Mission Street.[3] He heard a really loud noise – "like a really big boom," and went to locate the sound. He left his apartment, and went downstairs and outside through the apartment building's front door. As he left the apartment building's front door, Aparicio let in a man who lived in one of the apartments.[4] Once outside the building, Aparicio saw glass both on the sidewalk and still "coming down" from a broken window in Apartment 101B, which apartment was located above Aparicio's apartment. Aparicio noticed "fresh" "drops of blood" on the sidewalk by the building's front door. Aparicio was not sure where the blood came from, but he thought someone in Apartment 101B might be hurt. Aparicio made a 911 call to the police.

San Francisco Police Officers Leonard Morrow (Morrow), Richmond Curry (Curry), and Rich Trujillo (Trujillo), were among several police officers who responded to a 911 dispatch call of "vandalism" at the apartment building where Aparicio lived. Morrow arrived first and saw "very small pieces" of glass on the sidewalk and what appeared to be fresh blood droplets. Morrow also saw what appeared to be blood "smudges" on the name chart of the entrance pad for the apartment building's front gate.

---

[2]     Because defendant pleaded guilty, the facts of the investigation are taken from the testimony and evidence elicited at the combined preliminary examination and hearing on defendant's motion to suppress evidence.

[3]     The building was described as a multiple-story building, with a garage on the ground floor (first floor) and apartments on the second, third and fourth floors. Apartment 101A was on the second floor, Apartment 101B was on the third floor, and Apartment 201 was on the fourth floor.

[4]     Aparicio described the man's physical appearance and clothing. Aparicio did not notice if the man had any blood on him. At the combined preliminary examination and hearing on defendant's motion to suppress evidence, Aparicio identified defendant as possibly being the man he let into the apartment building.

From outside the apartment building, Curry observed the broken window in Apartment 101B, "glass on the street," and some "blood" drops on the sidewalk.

Curry spoke with Aparicio, who said he heard a loud crash like a window breaking. Following Curry's discussion with Aparicio, the police officers went to Apartment 101B. The police officers knocked on the door several times, identifying themselves as police officers, but there were no responses. Police Supervisor Sergeant Springer (Springer) was contacted and gave approval for the San Francisco Fire Department (SFFD) to make a forced entry. SFFD personnel forced open the front door of Apartment 101B and police officers entered to look for injured persons or suspects. The police officers observed that the shade on the broken window was pulled down and there were large shards of glass inside the apartment. Morrow could not tell if the window had been broken from the inside or the outside. The police officers did not find anyone in the apartment or "other evidence of burglary," aside from the broken window. The search of Apartment 101B took approximately 20 minutes.

Several police officers then followed a "blood trail" [5] from Apartment 101B to Apartment 201. Apartment 201 was directly above Apartment 101B. Outside Apartment 201, Morrow saw what appeared to be a "fresh" blood smudge to the right of the front door frame. Curry saw what appeared to be a blood smudge on the side of the front door and a little blood smudge on the top of the door. The police officers were concerned that someone in Apartment 201 was possibly injured and unable to get help as there had been no calls for assistance.

The police officers knocked on the front door of Apartment 201 to make a "safety check" to determine if any occupants inside the apartment were hurt or being held against

---

[5] Morrow described the blood trail as "intermittent;" "[i]f somebody was bleeding, it wasn't a steady stream," "[t]he droplets appeared to be maybe two or three feet in separation as you went up the steps." Photographs taken of the blood drops on the outside sidewalk and on the inside stairs of the apartment building, depicted "about seven blood drops," and "two different smears." When questioned about describing the blood drops as a "trail," Curry explained that the blood was going up the stairs, there was more than one drop and it was going in one direction, and there was blood on the door at Apartment 201.

3

their will.  After several knocks on the door, with no responses, Springer was contacted and again gave approval for a forced entry.  As SFFD personnel worked on the apartment door with tools, the police officers heard the voice of a man, later identified as defendant's voice, from inside the apartment.  Curry and Trujillo began to talk to defendant through the closed door.  Defendant partially opened the door, keeping the door latched with a chain to the door jamb.  Defendant asked, "What are you guys doing?  What do you want?"  Curry and Trujillo said they were doing a well-being check and wanted to see if everyone was okay because of the blood at the scene.  Defendant said, "I'm okay," and closed the door.  The police officers continued to talk with defendant, trying to explain why they wanted to make a well-being check.  Defendant again, partially opened the door, with the door still latched on a chain to the door jamb.  He again said he was okay and he did not want to open the door.  Trujillo replied, "Okay.  Let me see to make sure you're okay.  There's a [lot] of blood on the outside," but defendant kept the door partially closed and ultimately closed the door entirely.

Morrow then walked up to the closed apartment door and spoke with defendant through the closed apartment door.  Morrow said, " 'Open the door.  I just want to check and see how you're doing.  There's a lot of blood outside.  Somebody was cut.  Stuff happened because there's a lot of blood.  Somebody was cut.  Was it you?' . . ."  Defendant said, "Yes, but I'm okay.' "  Morrow said, " 'Let me see,' " and defendant unlatched the chain and completely opened the door.  Defendant was standing in the doorway; he had blood on his shirt and pants and a cut on his hand.  Although defendant had said he was okay, Morrow could not tell if defendant needed medical assistance.  Morrow heard noise from the back of the apartment and asked defendant if anyone else was inside the apartment.  Defendant said, "No."  But Morrow heard someone say, "Yeah, Yeah, I'm here, I'm here, I'm here also."  And, Morrow then heard footsteps behind defendant and another man, later identified as Steven Terrell, came into view.  Morrow grew concerned because defendant had lied when he said no one else was in the apartment.  Morrow ordered Terrell to come out of the apartment and Terrell walked toward Morrow.  Curry, who was right behind Morrow, looked into the apartment and

4

informed Morrow that he believed there was someone else in the apartment in addition to Terrell. As Curry spoke, Morrow saw something moving off to his right toward the back of the apartment. At that point, Morrow detained defendant and Terrell, telling them to keep their hands where the police officers could see them. Morrow, followed by Curry and Trujillo, entered the apartment to make sure there was no one else in the apartment that might be injured or needed assistance.

Once inside the apartment, [6] Curry saw "just things thrown all over the floor. There [were] two or three bags in the bathroom just inside the front door. They were sitting on the floor open, and it looked like . . . some white powder in clear ziploc bags, and . . . some blue pills that were in clear plastic bags inside the bags that were sitting on the floor in the bathroom." Morrow also observed on the bathroom floor three large partially open duffel bags, which contained large amounts of what appeared to be narcotics. The officers reported their findings to Springer. Springer directed the officers to "lock down" the scene while she arranged for the issuance of a search warrant.

## B. Issuance and Execution of Search Warrant

Police Officer Aaron Lozada was dispatched to Apartment 201, arriving there at about 11:00 a.m. After he viewed the scene and spoke with police officers who were present, he returned to the police station and prepared a "statement of probable cause" (affidavit) for a search warrant. In his affidavit, Lozada stated, in pertinent part, the following:

"On 8/11/13 around 0913hrs, SFPD Officers respondent to [a specified address] on a report of vandalism and possible burglary . . . . Once on the scene, Officers located a multi level apartment building. The first level is the garage/street. The second level houses apartment 101A and the third level is above that. The original 911 caller was in apartment 101A and reported that a white male 6' with a white hat, white jacket, and yellow pants asked to gain entry to his apartment. The 911 caller further reported that he

---

[6]     Morrow described the apartment as a "really small" one-bedroom. "The hallway's very narrow. The bathroom is right off the hallway. As soon as you walk in the front door, to your right is the bathroom. The bathroom door is like halfway open."

heard a loud bang and saw a window to the apartment on the 2nd floor with blood on the window. The 911 caller stated that the subject was last seen on the 3rd floor.

"From the public sidewalk, Officers saw a broken window above the 911 caller[']s apartment. On the sidewalk below the broken window was blood. Simu[l]taneously, Officers spoke with the 911 caller and learned that a family lived inside the unit with the broken streetside window. The blood trail from the sidewalk led into the apartment building and up the stairs. The trail led to the front door of the unit with the broken streetside window (101B). There was no answer to the door at 101B. Officers reasonably believed that someone was injured inside the unit. Officers requested San Francisco Fire Department to force entry. Other Officers also followed the blood trail up to the next floor. In front of unit 201, they located fresh blood on the wall next to unit 201. There was also blood on the floor in front of the door. Officer knocked on that door also.

"After forcing entry into 101B, Officer did not locate any victims, suspects, or signs of burglary inside that unit. Other Officers continued to knock on unit 201. Officers reasonably believed that there was other injured people and possible victims of a burglary inside unit 201. Just as SFFD personnel [were] going to force entry, Benjamin Hagerl . . . opened the door. He had fresh blood on his right hand and blood on his pants. He also matched the description provided by the 911 caller. Officers reported that from the threshold of 201 they could see blood on the doorjamb of the bathroom that was a couple feet into the unit on the right.

"Officers conducted a search of the unit looking for other injured parties or victims. During the search they located Steven Terrell . . . in the living room. He did not have any injuries. During the search, they located suspected narcotics in plain view in the bathroom, back bedroom, and floor of the living room. The Officers immediately froze the location pending authorization of a search warrant.

"I responded to . . . unit 201. In the living room, I located on the floor in plain view a clear plastic baggy containing a green leafy vegetable substance of suspected marijuana. . . . Based on my training and experience, I fully believe that substance is

6

marijuana. [¶] In the back bedroom, I located a clear plastic baggy containing multiple pills of suspected MDMA. . . . Officer Archilla conducted a presumptive narcotics test on one of the pills[, and using] a narcopouch kit #923 Marquis reagent the substance tested positive for MDMA. [¶] . . . Based on my training and experience, I fully believe that the suspected MDMA is MDMA. [¶] In the living room was a silver Apple laptop. The screen was on. On the screen I saw a webpage for "facebook.com". On the webpage were two messages from "Factor cuts". The messages read, '. . . master . . .' and 'How[']s my mule . . . .' [¶] In the bathroom were three black duffle bags. The bags were open and suspected narcotics were clearly visible without manipulating them or opening them. [¶] See Exhibit B attached hereto and incorporated by this reference, containing photos. [¶] Based on my training and experience, I know that mule is a term often used to describe a person used to smuggle or transport narcotics. . . . I fully believe that a search of the premise[s] will yield additional narcotics and evidence of narcotics sales and possession for sales."

After the issuance of the search warrant, Lozada told the police officers located at the scene to search Apartment 201. During their search, the police officers found approximately $28,000 in cash and large quantities of suspected narcotics, in powder and pill form, some of which tested positive for MDMA.

### C. Court Proceedings

### 1. Preliminary Examination and Hearing on the Section 1538.5(i) Motion to Suppress Evidence

The District Attorney filed a complaint charging defendant with several felony drug offenses under Health & Safety Code sections 11366, 11378, and 11379.2, with related special drug weight allegations. Sitting as a magistrate, Judge Phillip Moscone conducted a combined preliminary examination and hearing on the defendant's section 1538.5(i) motion to suppress evidence.

Before the hearing commenced, defense counsel confirmed that defendant's motion to suppress evidence would be limited to whether defendant's Fourth Amendment rights were violated by the police officers' initial entry into Apartment 201. If the

magistrate found a constitutional violation, then suppression of the evidence seized under the search warrant would be required as the fruit of an unlawful entry and search. If the magistrate denied the motion to suppress evidence after finding that the police officers' initial entry was valid, then defendant intended to pursue his *Franks* motion to traverse the search warrant.

The magistrate heard testimony from several witnesses including Aparicio (the 911 caller), and Officers Morrow and Curry. The magistrate denied the section 1538.5(i) motion to suppress evidence after finding that the police officers' initial entry into Apartment 201 was justified under their "community caretaking" duties, and that, once inside the apartment, the police officers observed in plain sight, an opened duffel bag containing wrapped parcels of suspected narcotics. The magistrate issued a holding order on two counts of possession for sale of a controlled substance, together with special drug weight allegations; and one count of maintaining a place for the sale of a controlled substance.

On October 18, 2013, the District Attorney filed an information charging defendant with the following felony offenses: (1) possession for sale of an analog of methamphetamine ("3,4 MDMA METHYLENEDIOXYMETHAMPHETAMINE (ECSTASY)") (Health & Saf. Code, § 11378), with a related special drug weight allegation that the substance "exceeded 20 kilograms by weight, within the meaning of Health and Safety Code section 11370.4(b)(4)," (2) possession for sale of an analog of methamphetamine ("3,4 MDMA METHYLENEDIOXYMETHAMPHETAMINE (ECSTASY)") (Health & Saf. Code, § 11378), with a related special drug weight allegation that the substance "exceeded four kilograms by weight, within the meaning of Health and Safety Code section 11370.4(b)(2);" and (3) maintenance of a place for selling or using a controlled substance (Health & Saf. Code, § 11366). On October 24, 2013, defendant pleaded not guilty to each count and denied the special drug weight allegations related to counts one and two.

## 2. Hearing on *Franks* Motion

On December 6, 2013, Judge John F. Stewart conducted a hearing on the *Franks* motion.[7] At the beginning of the hearing, defense counsel asked the superior court to consider all of the testimony elicited at the combined preliminary examination and hearing on the motion to suppress evidence. The superior court denied the request, explaining that it saw no purpose "to go back and cover everything that would have led up to [the police officers'] right to" enter Apartment 201, as the magistrate had already determined the officers had a right to enter the apartment. Defense counsel argued, however, that defendant wanted to establish that the factual averments in the search warrant affidavit regarding the reasons for the police officers' initial entry into Apartment 201 were inconsistent with the testimony proffered at the earlier hearing. According to defense counsel, if the true facts regarding the police officers' initial entry had been set forth in the affidavit, the magistrate (Hon. Julie Tang) would not have issued a search warrant. The superior court disagreed, stating that "it sounds to me like this motion is going back to the very beginning, did they have the right to [enter] in the first place, and that's already been determined." Defense counsel responded, "That's really not our objective. Our objective is to try to show you that there's been . . . willful falsity or reckless disregard for [the] truth in the allegations for a search warrant. Because when they go in and they come out there's no seizures. What we're seeking is to suppress the [seized evidence] predicated on [the] search warrant because we're saying . . . that this search warrant was [procured] on allegations that were in reckless disregard for [the] truth or there were material facts known to [the] officer at the time [but were] omitted, which would have impacted the decision of the magistrate who issued the search warrant." The superior court acquiesced and agreed to proceed with the hearing. It noted, however, that in this case the purported validity of the search warrant was

---

[7] Normally, a motion to traverse a search warrant is heard by the magistrate who issued the search warrant. (§ 1538.5, subd. (b).) However, Judge Julie Tang, who issued the search warrant in this case, granted defendant's Code of Civil Procedure section 170.6 motion for disqualification.

9

somewhat irrelevant because once the magistrate (Hon. Moscone) upheld the police officers' right to enter the apartment and observe the evidence, the police were entitled to "come out" and secure a search warrant for the items that they had earlier seen in the apartment. In response, defense counsel said, "If that's all they said we wouldn't be here. If they said we went in there and these are the things we saw. You're oversimplifying it. If you look at the allegations that are contained in the affidavit for [the] search warrant, they say certain things that from our perspective are untrue. . . . [Y]ou want to call it willful falsity. I don't want to have to go that far, but certainly reckless disregard for truth which is one of the *Franks* criteria." Without further comment, the superior court proceeded to hold the requested hearing.

The superior court admitted into evidence the search warrant and the affidavit of probable cause, the reporter's transcript of Aparicio's testimony elicited at the combined preliminary examination and hearing on the motion to suppress evidence, and all the photographs attached to defendant's motion papers, including photographs of the broken window and blood trail. Defendant also called as witnesses Officers Curry, Morrow, and Lozada.

Curry testified regarding the circumstances surrounding the police officers' initial entry into Apartment 201. He confirmed that outside the front door of Apartment 201, he observed blood on the doorframe, i.e., "basically the trim around the door." The blood on the doorframe was "a smudge," and then Curry saw "a little bit more blood just on the top part of the door[,] . . . another handprint." Curry did not see any blood in the apartment before he entered the apartment, but he saw blood after he entered. Specifically, "there was some [blood] on the wall just as you walk through the front door. The wall on the right-hand side." When asked if defendant was the source of the blood, Curry replied there could have been another injured person inside the apartment. Curry was also questioned about certain statements made in Lozada's affidavit. Curry did not learn that a tenant had gained entry to the building until after defendant and Terrell had been detained and the police officers discovered the men had outstanding warrants.

Morrow testified he had been dispatched to the apartment building on a call of vandalism. He was not then advised that a possible burglary was either in progress or had occurred at that location. However, once he arrived at the apartment building and after observing "everything that was there," Morrow believed he might be there for "one of three things. Burglary, vandalism, or well being checks, somebody's hurt."

At the police station, Morrow spoke with Lozada before Lozada prepared his affidavit of probable cause for the search warrant. Morrow told Lozada his "version" of what had occurred at defendant's apartment. When asked if he ever saw any evidence of a burglary inside Apartment 101B, Morrow said yes, because all he needed for evidence of burglary was the "massive" broken window, which appeared to have imploded and looked like someone had smashed the window trying to do something and apparently some one had gotten cut. It was only after all the facts were in that it was the collective judgment of law enforcement that no burglary had occurred, but at the time of the investigation the police officers did not know "what was going on."

Lozada testified regarding his preparation of the affidavit of probable cause, which was submitted with the search warrant application. The information in the affidavit was based on both Lozada's own observations at the scene and his discussions with other officers. Lozada spoke with Police Officer Hornstein and Police Sergeant Springer at the apartment building, and with Curry and Morrow at the police station.

When Lozada arrived at the apartment building, the police officers showed him the blood trail, they explained how they got into Apartment 201, and showed him the items they had observed in plain view, which included the partially open black duffle bags that were inside the bathroom. According to Lozada, the blood drops and blood smears were sufficient to allow the police officers to follow the blood up two flights of stairs and down the hallway. When Lozada got to Apartment 201, "the initial entry had already been made. There was blood on the door just inside. It was on the bathroom door. So when you're looking at the front door, you look through the threshold. To the right there's a bathroom and there was blood on the doorjamb that I could see. That is one of the largest smears that I saw." Lozada included in his affidavit that there was

11

blood on the floor in front of the door of Apartment 201 because he had personally observed that blood, albeit there was no photograph showing that blood.

Lozada explained that his statement in the affidavit that the officers had responded to a report of vandalism and possibly burglary was based on the fact that there was a broken window and someone had possibly gained entry into Apartment 101B. In the affidavit, Lozada stated that after forcing entry into Apartment 101B, the police officers did not locate any victim, suspects, or "signs of burglary inside that unit." Lozada explained that his statement, namely, that there were no signs of burglary, meant that there was no ransacking and no one was found inside that apartment.

Lozada also explained that he had included a statement concerning the description of the man seen by the 911 caller, even though he knew when he wrote the affidavit that the man lived in Apartment 201. The purpose of the statement in the affidavit was to simply include information that was known to the investigating police officers before their initial entry into Apartment 201. During the investigation, the police officers did not know that the tenant had not been identified as a person who broke the window, that the 911 caller had not seen blood on the tenant, or that the tenant was the man who wanted to get upstairs. Because he was not present and did not know the exact details, Lozada did not include in the affidavit the interactions between the investigating police officers and defendant and Terrell. Lozada believed the circumstances confronted by the investigating police officers (broken window and a sufficient blood trail) would lead them to reasonably believe that someone could possibly be injured enough to require immediate medical assistance and there might be other injured people inside Apartment 201.

Following counsel's arguments, the superior court denied the *Franks* motion. In so ruling, the superior court explained that even excluding all of the affidavit's statements challenged by defendant, the basic information in Lozada's affidavit of probable cause –

12

a "very suspicious looking" broken window in Apartment 101B[8], and the blood drops and blood smears at the scene that led to the door of Apartment 201[9] – would "still lead to a magistrate [to think there was] a reason to investigate inside" Apartment 201. When defendant opened the door, the officers "are told that there's nobody else inside the apartment, someone else is in the apartment, they see some blood inside, and so they go in." According to the court, "Just looking at that window, you think somebody smashed into that window which it could have been a body or a person the way it's broken. You would think there would be more injuries or could well be more injuries than just what [the police officers] initially saw when [defendant] opened the door. [¶] [So] just reducing it down to the essence of that window and this trail of blood not knowing what

---

[8]   The court described the significance of the broken window in the following manner: "This window was completely demolished. And I'm not sure of the size of the window. But it's a pretty good size. It's got five panes going vertically and three panes going horizontally. That's 15 panes of glass. [¶] And the panes looked like they're roughly a foot high. . . . It's a substantial window. It's not just a small window. [¶] The point is, every single pane is broken. It's not just a rock thrown into a window. [¶] And more importantly, all the metal panes are completely distorted. They're all broken, and busted, and twisted. [¶] From this angle, it looks like they're bending out. I don't know if they were or not, but this angle looks like the panes are going from the inside out which would look like somebody smashed into it from the inside. [¶] But whatever hit that thing was big, because it wasn't just a rock. So it's a very suspicious looking window." The court later explained, "I mean, I haven't seen many windows that looked like that. This is not just your ordinary run of the mill broken window. Something strange happened to that window . . . ."

[9]   The court described the significance of the presence of blood in the following manner: "There's not a huge amount of blood, but there's blood. And it's not unreasonable to suspect whatever left the blood observation had something to do with this broken window because the window, there's [shards] hanging from it. It's certainly easy to look at that window and say, whatever hit that thing, if a person was involved, they could have cut themselves. [¶] So certainly it is not a stretch to associate the blood with a broken window. [¶] . . . [¶] . . . [¶] . . . And observation[s] are some drops of blood going up the stairs. [¶] So they follow the blood, and it goes to door 201 to the apartment. There is some blood on the door, a small amount, but there's some blood on the door. There's some blood on the wall next to the door, a small amount, but there's blood. [¶] The pictures didn't show any blood in front of the door, on the floor, but there's blood on the door. So it's certainly reasonable to think that a person who left the blood is inside that apartment."

13

happened, I think that gives probable cause for the officers to go inside to conduct a well-being check. [¶] That, coupled with the fact that the search warrant indicates that they saw narcotics in plain view, and this officer didn't falsify that because that's the way they were when he saw them, and he was told that's the way they were when [the police officers] first went in . . . . [¶] I just find there is a basis for the search warrant, and I'll deny the motion."

### 3. Section 995 Motion, Change of Plea Proceeding and Sentence

Following the denial of the *Franks* motion and before the adjudication of a section 995 motion to dismiss the information, defendant pleaded guilty to possession for sale of a controlled substance as alleged in count one of the information. The other counts and the special drug weight allegations related to counts one and two were dismissed on the motion of the district attorney. The court imposed the promised sentence of three years in state prison, to be served in county jail pursuant to section 170, subdivision (h). This appeal ensued.

## DISCUSSION

### I. Legality of the Police Officers' Initial Entry into Apartment 201

We initially agree with the Attorney General that defendant has forfeited appellate review of the issue of the legality of the police officers' initial entry into Apartment 201. A criminal defendant may test the legality of a entry into his residence "by making a motion to suppress at the preliminary [examination] and, if unsuccessful, renewing the motion in superior court if held to answer. (§ 1538.5, subd. (i)[10].)" (*People v. Superior*

---

[10] Section 1538.5 (i) provides, in pertinent part: "If the property or evidence obtained relates to a felony offense initiated by complaint and the defendant was held to answer at the preliminary hearing . . . the defendant shall have the right to renew or make the motion [in the superior court] at a special hearing relating to the validity of the search or seizure . . . . If the motion was made at the preliminary hearing, unless otherwise agreed to by all parties, evidence presented at the special hearing shall be limited to the transcript of the preliminary hearing and to evidence that could not reasonably have been presented at the preliminary hearing, except that the people may recall witnesses who testified at the preliminary hearing. If the people object to the presentation of evidence at the special hearing on the grounds that the evidence could reasonably have been

14

*Court (Cooper)* (2003) 114 Cal.App.4th 713, 717.) However, to obtain direct appellate review of the denial of a section 1538.5(i) motion to suppress evidence made at a preliminary examination, a defendant has to renew his motion in the superior court *on the same ground* raised before the magistrate at the preliminary examination. (See *People v. Lilienthal* (1978) 22 Cal.3d 891, 896; *People v. Richardson* (2007) 156 Cal.App.4th 574, 586-595; *People v. Hoffman* (2001) 88 Cal.App.4th 1, 3.) At the outset of the hearing on the *Franks* motion, defense counsel explicitly stated it was "really not [defendant's] objective" to have the superior court review the magistrate's denial of the section 1538.5(i) motion to suppress evidence. Instead, defendant's objective was only "to try to show . . . willful falsity or reckless disregard for [the] truth in the allegations for a search warrant . . . or there were material facts known to [the police] officer at the time that [were] omitted, which would have impacted the decision of the magistrate who issued the search warrant." Given defendant's concession at the *Franks* motion as to the limited nature of the relief he was seeking from the superior court, we reject his argument that he renewed his motion to suppress evidence as required by section 1538.5(i).

We also reject defendant's arguments that the issue of legality of the police officers' initial entry into Apartment 201 is properly before us because he was allowed to "relitigate" de novo and secured an independent ruling on the issue in the superior court. Section 1538.5(i) entitles a defendant to only one full evidentiary hearing on his motion to suppress evidence. (*People v. Bennett* (1998) 68 Cal.App.4th 396, 405.) If a defendant makes a motion to suppress evidence at the preliminary examination, section 1538.5(i) does not grant him "a de novo" hearing in the superior court, except in circumstances not present here. (*People v. Drews* (1989) 208 Cal.App.3d 1317, 1324; see § 1538.5(i).) Thus, the superior court had "no statutory or inherent authority to enlarge the scope of the hearing" on the *Franks* motion to consider de novo the legality of

presented at the preliminary hearing, the defendant shall be entitled to an in camera hearing to determine that issue. The [superior] court shall base its ruling on all evidence presented at the special hearing and on the transcript of the preliminary hearing, and the findings of the magistrate shall be binding on the [superior] court as to evidence or property not affected by evidence presented at the special hearing."

the police officers' initial entry into Apartment 201.  (*People v. Bennett, supra*, 68 Cal.App.4th at p. 405.)  And, no such enlargement of the scope of the hearing on the *Franks* motion occurred in this case as (1) defendant conceded he was not seeking review of the magistrate's denial of the section 1538.5(i) motion to suppress evidence, (2) the superior court explicitly indicated its ruling would be limited to resolving the *Franks* motion; and (3) the testimony elicited at the superior court hearing was only adduced in connection with defendant's assertion that Lozada's affidavit contained false or misleading statements and omitted material facts.  Likewise, we conclude the superior court did not "independently rule" on the issue of the legality of the police officers' initial entry into Apartment 201.  In rendering its decision on the *Franks* motion, the superior court commented that the broken window and blood trail "gives probable cause for the officers to go inside to conduct a well-being check."  However, we do not read the comment in isolation but as part of the superior court's ruling on the *Franks* motion. When so read in context, we find that the comment was merely a response to and rejection of defendant's argument that Lozada's affidavit "was fabricated to obfuscate the illegality of the initial entry" into Apartment 201.

Even if defendant is not procedurally barred from seeking direct appellate review of the legality of the police officers' initial entry into Apartment 201, we conclude there is no basis to set aside the magistrate's denial of his motion to suppress evidence.  The police officers' observations, and defendant's responses to the officers' inquiries, constitute substantial evidence supporting the police officers' entry into defendant's apartment under the "emergency aid exception" to the warrant requirement.  The "emergency aid exception" to the warrant requirement permits the police to " 'enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'  [(*Brigham City v. Stuart* (2006) 547 U.S. 398, 403).]"  (*Michigan v. Fisher* (2009) 558 U.S. 45, 47.)  Despite defendant's arguments to the contrary, "[t]his 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.  [(*Brigham City v. Stuart, supra*, 547 U.S. at pp. 404-405.)]  It requires

16

only 'an objectively reasonable basis for believing,' [(*id*. at p. 406)], that 'a person within [the house] is in need of immediate aid,' [(*Mincey v. Arizona* (1978) 437 U.S. 385, 392).]" (*Michigan v. Fisher, supra,* 558 U.S. at p. 47.)

## II. Superior Court's Denial of the *Franks* Motion

Defendant also challenges the superior court's denial of the *Franks* motion. We conclude that none of his contentions warrants reversal.

"In *Franks v. Delaware* (1978) 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667], the United States Supreme Court held that a defendant may challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. When presented with such a challenge, the lower courts must conduct an evidentiary hearing if a defendant makes a substantial showing that: (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to justify a finding of probable cause. At the evidentiary hearing, if the statements are proved by a preponderance of the evidence to be false or reckless, they must be considered excised. If the remaining contents of the affidavit are insufficient to establish probable cause, the warrant must be voided and any evidence seized pursuant to that warrant must be suppressed. (*Id*. at pp. 155-156 [98 S. Ct. at pp. 2676-2677].)" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1297 (*Bradford*).)

Additionally, "[a] defendant can challenge a search warrant by showing that the affiant deliberately or recklessly omitted material facts that negate probable cause when added to the affidavit. (*Franks v. Delaware*[, *supra*,] 438 U.S. [at pp. 171-172] [57 L.Ed.2d 667, 98 S.Ct. 2674]; *People v Gibson* (2001) 90 Cal.App.4th 371, 381-382 [108 Cal.Rptr.2d 809].)" (*People v. Eubanks* (2011) 53 Cal.4th 110, 136.) "A defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that the omissions were material to the determination of probable cause. (See *People v. Luttenberger* (1990) 50 Cal.3d 1, 14-15 & fn. 4 [265 Cal.Rptr. 690, 784 P.2d 633].) 'Pursuant to [California Constitution, article I,] section 28[, subdivision] (d), materiality is evaluated by the test of *Illinois v. Gates* (1983) 462 U.S. 213 . . , which

17

looks to the totality of the circumstances in determining whether a warrant affidavit establishes good cause for a search. [Citation.]' (*People v. Luttenberger, supra*, 50 Cal.3d [at p.] 23.)" (*Bradford, supra*, 15 Cal.4th at p. 1297.) If the affiant intentionally or recklessly omitted a material fact relevant to the finding of probable cause or the lack thereof, such a fact is added to the affidavit, which is then retested for probable cause for a search. (*People v. Kurland* (1980) 28 Cal.3d 376, 385-388.)

On appeal defendant challenges certain statements and omissions in Lozada's affidavit in the following manner: (1) affidavit statement, that officers responded to "a report of a vandalism and possible burglary," is false because the report was that officers responded to only a vandalism and that when the officers entered Apartment 101B, the officers discovered no signs of entry, burglary, struggle, suspects, or victims; (2) affidavit statement, that original 911 caller reported a " 'white male, with a white hat, white jacket, and yellow pants asked to gain entry to his apartment,' who was 'last seen on the third floor,' " omits the fact that this man was a tenant who lived on the third floor, and is misleading as magistrate would think this man was an unidentified suspect instead of a recognized tenant who was not regarded as suspicious, and when coupled with false statement of possible burglary, appears to be a deliberate attempt to manufacture probable cause where there was none; (3) affidavit statement, that officers observed a "blood trail," omits that the officers observed "a few drops and smears over the course of three flights of stairs;" (4) affidavit statement, that defendant opened the door " 'just as SFFD personnel w[ere] going to force entry,' " is false because just prior to defendant opening the door, the SFFD personnel had already inserted a pry tool and had begun forcing the door to the extent that the wood door frame was splintered and chipped; also, this statement "alters the assessment of when officers actually breached the door, and conceals the fact that officers forced entry into [A]partment 201 over [defendant's] strenuous objections;" (5) affidavit statement omits the facts that "in response to authoritative police commands," defendant initially only opened the door partially with the chain lock still in place, and told the officers he did not need assistance and repeatedly refused entry; also this omission is relevant because it refutes any reasonable

18

need for the officers to conduct any further well-being check or belief that defendant was in need of medical assistance; (6) affidavit statement omits that the scant blood observed on the scene was explained away when defendant came out of the apartment, was identified as the source of the blood, and defendant said he did not need assistance, and Terrell voluntarily came out of the apartment with no blood on him; (7) affidavit statement, that "[s]tanding at the threshold (of [A]partment 201), officers could see blood on the threshold of the bathroom," "constitute[s] a falsehood which would mislead the magistrate," because the initial investigating officers did not observe blood inside Apartment 201 before forcing entry into the apartment. Defendant then contends that a retesting of Lozada's affidavit– with the alleged false statements excised, the misrepresentations corrected, and the omitted facts included – demonstrates that the magistrate would not have had sufficient facts to find that the police officers had lawfully entered Apartment 201 based on the "emergency aid exception" to the warrant requirement. We find defendant's contentions are unavailing.

Retesting Lozada's affidavit, as defendant suggests, we conclude that the magistrate (Hon. Julie Tang) would nonetheless have had sufficient facts demonstrating that the police officers' initial entry into Apartment 201 was supported by the "emergency aid exception" to the warrant requirement. Having been dispatched on a report of vandalism, the investigating police officers encountered a situation of a massive destruction of the window in Apartment 101B, and the presence of fresh blood leading from outside to inside the apartment building to Apartment 101B and ultimately to Apartment 201. Under these circumstances, we are confident the magistrate would have concluded that the police officers had an objectively reasonable basis to believe that one or more persons might be seriously injured and needed assistance inside Apartment 201. (See *Michigan v. Fisher, supra*, 558 U.S. at p. 49 [police officers did not need "ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception"]; *People v. Troyer* (2011) 51 Cal.4th 559, 607 (*Troyer*) ["[b]loodstains on the door signaled that a bleeding victim had come into contact with the door, either by entering or by exiting the residence"].) We are also confident the police officers' reliance

19

on the "emergency aid exception" to the warrant requirement would not have been called into question had the magistrate been informed that defendant had repeatedly refused entry, told the officers he did not need assistance, and defendant explained he was the source of the blood. Given the fact that any person coming into contact with the broken window would have likely suffered more than a cut on the hand, the police officers were not required to accept defendant's explanation that he was the sole source of the blood and there was no one else who was injured and needed assistance in Apartment 201. (*State v. Frankel* (2004) 179 N.J. 586 [847 A.2d 561, 574] ["[t]he responding police officer is not required to accept blindly the explanation for the 9-1-1 call offered by the resident answering the door . . ."], cited in *Troyer, supra*, 51 Cal.4th at p. 608; see *State v. Mielke* (2002) 257 Wis.2d 876 [653 N.W.2d 316, 319] ["[w]hen a police officer is confronted with two reasonable competing inferences, one that would justify the search and another that would not, the officer is entitled to rely on the reasonable inference justifying the search"], cited in *Troyer, supra*, 51 Cal.4th at p. 613.)

Because defendant has failed to meet his burden of challenging the "integrity of the [search] warrant affidavit," we see no reason to reverse the superior court's denial of the *Franks* motion.

### DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

20